**DICKINSON WRIGHT PLLC**
JUSTIN J. BUSTOS, Nevada Bar No. 10320
Email: jbustos@dickinson-wright.com
100 West Liberty Street, Suite 940
Reno, NV 89501
Tel: (775) 343-7500
Fax: (844) 670-6009

**COOLEY LLP**
Sarah Lightdale *(pro hac vice)*
Kaitland Kennelly *(pro hac vice)*
Amanda Liverzani *(pro hac vice)*
Email: slightdale@cooley.com
Email: kkennelly@cooley.com
Email: aliverzani@cooley.com
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275

Alexandra Rex Mayhugh *(pro hac vice)*
Email: amayhugh@cooley.com
Wells Fargo Center, South Tower
355 South Grand Avenue, Suite 900
Los Angeles, CA 90071
Tel: (213) 561-3250
Fax: (213) 561-3244

*Attorneys for Plaintiff Mind Medicine (MindMed), Inc.*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MIND MEDICINE (MINDMED) INC., a British Columbia Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT DR. FREEMAN, an individual, and FCM MM HOLDINGS, LLC, a Wyoming Limited Liability Company,<br><br>Defendants. | Case No. 2:23-cv-01354-RFB-VCF<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT SCOTT FREEMAN'S ANTI-SLAPP SPECIAL MOTION TO DISMISS**<br><br>**ORAL ARGUMENT REQUESTED** |

1

## I.   INTRODUCTION

2

3          This is a contract case; Dr. Freeman breached his Separation Agreement and MindMed

4    seeks to hold him liable for it. Because Dr. Freeman has no real response to MindMed's

5    straightforward contract claim, he has inundated the Court with irrelevant facts and specious

     theories. His Anti-SLAPP Motion is just the latest example of this strategy, and it fails.

6          Dr. Freeman devotes a full third of his 45-page Anti-SLAPP Motion to chronicling what

7    he characterizes as a decade-long "life-altering feud" with a former business partner, Stephen

8    Hurst, concerning a company, Savant, that they formed together in 2013. None of this has any

9    bearing on Dr. Freeman's breaches, in 2022 and 2023, of his Separation Agreement with

10   MindMed. Dr. Freeman's anti-SLAPP legal theories likewise fall far from the mark. He ignores

11   the public forum requirement; insists (contrary to case law) that any and all statements involving

12   publicly traded companies are unconditionally shielded by statute; and offers as "proof" of good

13   faith a self-serving and conclusory declaration that wilts under the evidence of his misbehavior.

14   Dr. Freeman also makes a curious argument that NRS 41.650 offers him "total immunity," such

15   that the Court should not even consider the merits of MindMed's Complaint—a notion which finds

16   no support in the legislative history of the statute or anywhere else. At bottom, Dr. Freeman asks

17   this Court to nullify standard anti-disparagement clauses in employment agreements so long as the

18   disparaging statements are made in furtherance of "board representation." This is not the law

19   anywhere, and the Court should not make it so here.

20         MindMed's claims have far more than the "minimal merit" required for Dr. Freeman's

21   Anti-SLAPP Motion to be denied. In his Motion, Dr. Freeman makes both legal and factual

22   challenges to the Complaint. His legal challenges—*e.g.*, failure to state a claim, agreement void

23   for lack of consideration, interpretation of anti-disparagement clause (ECF No. 75 ("Anti-SLAPP

24   Mot.") at 29-30, 35-39)—fail for the reasons addressed at length in MindMed's concurrently filed

25   Opposition to Dr. Freeman's Rule 12(b)(6) Motion ("Rule 12(b)(6) Opp.").[1] His factual

26

_____

27   [1] MindMed explicitly incorporates its Rule 12(b)(6) Opp. by reference. This brief assumes
     familiarity with the facts alleged in the Complaint and the arguments set forth in the Rule 12(b)(6)
28   Opp. In the interest of efficiency, MindMed does not repeat those facts or arguments herein.

challenges—*e.g.*, fraudulent inducement, lack of alter ego relationship, failure to show breach of the confidentiality clause, and lack of damages (Anti-SLAPP Mot. at 35-36, 37-38, 39-40, 42-43)—fail under Rule 56 because Dr. Freeman cannot show, particularly at this early stage of the case, that all material facts are undisputed. Indeed, dismissal now, before any discovery has taken place, would be contrary to the Federal Rules of Civil Procedure and unjust to MindMed. Like his Rule 12(b)(6) Motion, Dr. Freeman's Anti-SLAPP Motion should be denied.

## II.   BACKGROUND[2]

### A.   Dr. Freeman's Employment and Removal from MindMed.

Dr. Freeman acknowledges that he was accused of workplace misconduct while employed at MindMed. *See* Anti-SLAPP Mot. at 4. Without addressing the substance of that accusation, he seeks to brush it off as "a pretext for his removal," and then goes on to speculate (based on what "timing" supposedly "suggests") that it was actually "[Dr.] Freeman's concerns about [clinical trial] safety [that] cost him his position." *Id*. The unauthenticated evidence proffered by Dr. Freeman does not support his conclusion:

- **ECF No. 75-1 ("S. Freeman Decl.") ¶ 6**: Dr. Freeman's declaration in support of his Anti-SLAPP Motion does not address the reasons for his removal at all. In setting out his alternate removal theory, his brief inexplicably cites a paragraph of his declaration that states, "FCM observed all corporate formalities." *See* Anti-SLAPP Mot. at 4.[3]

---

[2] Dr. Freeman's sprawling 45-page brief introduces a litany of irrelevant facts in an apparent effort to obfuscate the claims and issues relevant to adjudicating this Anti-SLAPP Motion. MindMed has sought to limit this brief to only the salient facts and issues necessary to deny the Anti-SLAPP Motion. By doing so, MindMed does not concede any of the facts or other issues raised by Dr. Freeman or waive its right to challenge those assertions at a later date.

[3] MindMed objects to Dr. Freeman's reliance on his declaration to the extent it seeks to introduce facts that are not within Dr. Freeman's personal knowledge. *See* Fed. R. Evid. 901(b); *Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 960 (D. Nev. 2018) ("unauthenticated documents cannot be considered [at] summary judgment"). For example, Dr. Freeman states, "Barrow and Vallone continually 'refresh' its members on the MindMed board, so they all have 'plausible deniability.'" S. Freeman Decl. ¶ 5. Dr. Freeman does not identify the material he purportedly quotes from, much less how he has personal knowledge of this allegation. Other statements about FCM's corporate practices and intent are likewise speculative to the extent Dr. Freeman claims that he "stepped down from FCM leadership." *Id*. ¶ 7; *see id*. ¶¶ 6, 14.

- **3 Compl. App. 344 (Compl. Ex. R)[4]**: In May 2023—years after Dr. Freeman's removal—FCM filed proxy advocacy materials including a slide representing that Dr. Freeman was suspended after a MindMed clinical trial halt. The selective nature of the slide is clear, as it does not mention the misconduct accusation that Dr. Freeman now acknowledges.

- **1 App. 33 (Mot. Ex. 20)[5]**: This unauthenticated and undated text message exchange between unidentified participants does not mention Dr. Freeman's termination.[6]

- **1 App. 235-242 (Mot. Ex. 21)**: This unauthenticated document appears to be a printout from ClinicalTrials.gov purportedly summarizing a history of changes to a study to assess 18-Methoxycoronaridine. Nothing in the document shows any changes or suggests the study was halted due to safety concerns, and it does not mention Dr. Freeman at all.[7]

---

[4] The Complaint in this action was filed as an exhibit to FCM's Notice of Removal at ECF No. 2-1, Ex. A at 7-48. All exhibits cited herein as "Compl. Ex." are attached to the Complaint and have been authenticated by the Declarations of Robert Barrow and Amanda Liverzani filed at ECF Nos. 33-1, 33-2. The actual exhibits can be found within Ex. A of FCM's Notice of Removal, which spans three docket entries: ECF No. 2-1 at 49-238 (Exs. B-H & J-K); ECF No. 3-1 (Exs. L-Y); and ECF No. 4-1 (Exs. A & I).

[5] All exhibits cited herein as "Mot. Ex." are attached to the Appendix filed concurrently with Freeman's Anti-SLAPP Motion. The actual exhibits span four docket entries: ECF No. 76 (Exs. 1-24); ECF No. 77 (Exs. 25-48); ECF No. 78 (Exs. 49-56); and ECF No. 79 (Exs. 57-60).

[6] MindMed objects to the admissibility of the text message screenshots filed in support of the Anti-SLAPP Motion (Exs. 12, 20, 22, 35-38, 42-43), which Dr. Freeman tries to authenticate with a single sentence: "The text messages in my exhibits are true and correct copies of text messages from JR which I saved as screenshots on my iPhone." S. Freeman Decl. ¶ 11. Dr. Freeman's single-sentence statement is insufficient to authenticate the numerous text message screenshots attached to the Notion. *See Nuttall v. Juarez*, 2015 WL 13762165, at *1 (C.D. Cal. July 1, 2015) (reference to exhibits "collectively" and failure to "attest to the identities of senders and recipients, timing, or the content of the [documents]" insufficient for authentication).

[7] MindMed objects to the admissibility of this document and the remainder of the documents (*i.e.*, all documents other than the text message screenshots discussed at note 6 *supra*) filed in support of the Anti-SLAPP Motion, which Dr. Freeman tries to authenticate with a single sentence from his counsel: "***Exhibits 1-60***, attached to this declaration as Appendices Vol 1-4, are all true and correct copies of documents provided to me by Dr. Scott Freeman as described in the index to the appendix." ECF No. 75-3 ¶ 3 (emphasis added). Mr. Smith's single-sentence declaration, which purports to authenticate a range of material—including emails threads (which he is not on), website printouts (which he did not pull), agreements (to which he is not a party), and other irrelevant material (such as a commencement brochure and a university magazine)—is clearly improper. *See Romero v. Nevada Dep't of Corr.*, 2014 WL 4828802, at *4, 8 n.6 (D. Nev. Sept. 30, 2014) (rejecting counsel's attempt to authenticate documents through declarations "that do nothing except state what counsel purports these items to be"), *aff'd*, 673 F. App'x 641 (9th Cir. 2016);

- **2 App. 244 (Mot. Ex. 22)**: This unauthenticated Dec. 7, 2020 text message exchange with "jamon.rahn@icloud.com" describes Dr. Freeman's termination as a "mistake by [his] partner" and does not mention safety.

- **4 App. 346-350 (Mot. Ex. 34)**: This unauthenticated and undated printout of Kathleen Monroe's LinkedIn profile (unsurprisingly) does not mention Dr. Freeman, much less the circumstances surrounding his removal from MindMed.

### B.    Dr. Freeman's Separation Agreement.

MindMed wished to separate from Dr. Freeman and manage the transition in an organized and non-disruptive fashion. It therefore agreed to enter into the Separation Agreement, which provided Dr. Freeman with valuable severance benefits that he would otherwise not have been entitled to given his short tenure. *See* Compl. ¶¶ 2, 50, 57-66; ECF No. 33-1 ("Barrow Decl.") ¶ 10. In exchange, Dr. Freeman agreed to be bound by a mutual non-disparagement provision, a non-disclosure provision, and a release provision. *See* Compl. Ex. A at 463-66; Barrow Decl. ¶ 10.

During the Separation Agreement negotiations, Dr. Freeman was represented by an attorney named L. Reid Skibell. Declaration of Alexandra Mayhugh ("Mayhugh Decl.") ¶ 3. Mr. Skibell currently represents Dr. Freeman in another case pending in the Southern District of New York. *Id*. Ex. A. There, Mr. Skibell, on behalf of Dr. Freeman, is arguing exactly the opposite of what Dr. Freeman's Nevada-based lawyers are arguing to this Court: that the Separation Agreement is valid and enforceable and, in fact, requires transfer of that unrelated action to this district due to the Separation Agreement's forum selection clause. *See Mind Medicine (MindMed) Inc. v. Dr. Freeman, et al.*, No. 1:23-cv-07875-DLC ("New York Action"), ECF No. 31 at 10.

### C.    Dr. Freeman Forms FCM and Disparages MindMed and its Leadership.

Between June 2021 and May 2022, Dr. Freeman made multiple "offers" to serve on MindMed's Board. Compl. Ex. N at 269. After MindMed declined these overtures, Dr. Freeman abandoned his attempts to "quietly . . . engage with MindMed." *Id*. On August 4, 2022, with his nephew Jake Freeman, a twenty-year-old college student, Dr. Freeman formed FCM. Compl. ¶ 16.

---

*Nuttal*, 2015 WL 13762165, at *1 (declaration "lack[ed] the requisite level of detail necessary to authenticate" web page and email exhibits).

Dr. Freeman's intimate involvement in FCM's formation, purpose, and early operations is undisputed. *See* Rule 12(b)(6) Opp. §§ II, III.B.1-2. Dr. Freeman declares that, at some unspecified point in time, he developed concerns about FCM's activities and attempted to distance himself from the leadership of the organization. S. Freeman Decl. ¶ 7. There is no contemporaneous or authenticated evidence before the Court now to shed light on when or why this supposedly occurred, and because discovery has not yet started, MindMed has not yet had an opportunity to test Dr. Freeman's declaration at a deposition. Indeed, the current record suggests that if Dr. Freeman nominally "stepped down from FCM" (*id.*), it was to obscure his breaches of the Separation Agreement, which included disclosing confidential MindMed information. *See* Compl. ¶ 88 (Jake Freeman opining on the significance of certain communications between the FDA and MindMed); Barrow Decl. ¶ 9 (Mr. Barrow attesting that the FDA-MindMed communications were confidential and not public); Compl. ¶ 88 (Jake Freeman implying that Dr. Freeman had shared MindMed confidential information with FCM that he was "not at liberty to discuss"); Compl. ¶ 90 (FCM tweeting that it had access to confidential information with "NDA implications"). In any event, FCM's contemporaneous statements show that Dr. Freeman continued to manage FCM, use FCM to advance his personal agenda, and direct the content of FCM's communications (which routinely quoted Dr. Freeman and invoked his name), all while holding the vast majority of MindMed shares FCM claimed to represent. *See, e.g.*, Compl. Exs. J, N, O, P, Q, U, W; ECF No. 33-3 Ex. A.

On March 30, 2023, Dr. Freeman executed FCM's notice of intent to initiate a proxy contest on FCM letterhead that listed only his name. Liverzani Decl. Ex. D. On April 6 and 11, 2023, Dr. Freeman then attended and spoke as a representative of FCM at multiple meetings with MindMed relating to the anticipated proxy contest. Liverzani Decl. Ex. B at 54-55.

From FCM's formation through the 2023 proxy fight, both Dr. Freeman and FCM issued numerous disparaging statements about MindMed in direct breach of the Separation Agreement—including, *inter alia*: (1) accusing MindMed's management of "divid[ing] its attention among too many different projects . . . at the cost of cash and decreased focus on MindMed's core drugs," engaging in "unnecessary cash burn" and "non-essential research and development," and

maintaining a "compensation structure for Board members [that] does not . . . maximize shareholder value" (Compl. ¶¶108-110; Compl. Ex. C); (2) baseless speculation that MindMed's former Chief Legal Officer may have been "asked to do something that . . . doesn't seem to be in her ethical duties as a lawyer" (Compl. ¶ 121); and (3) false allegations that MindMed's leadership had "misstated its related party transactions," was "engag[ing] in self-dealing at the expense of MindMed shareholders," and that "Robert Barrow may be implicated in criminal activity" (Compl. ¶¶ 130-133; Compl. Exs. G, H). *See also* Rule 12(b)(6) Opp. §§ III.B.1-2.

In one interview Jake Freeman mocked CEO Robert Barrow's "ego" and claimed that he was "trying to make up for" the fact that he lacked "an advance degree." Compl. ¶ 121; Liverzani Decl. ¶ 28. This statement was false—Mr. Barrow holds an advanced degree in pharmacology, a fact that is easily verifiable on MindMed's website. *See* Barrow Decl. ¶ 3; Liverzani Decl. Ex. C. FCM also sent a letter to McLean Hospital, where MindMed Chair Carole Vallone served on the Board, that was replete with false, disparaging accusations and veiled threats about Ms. Vallone. *See* Compl. Ex. I; Barrow Decl. ¶¶ 7-8.

FCM's proxy materials featured Dr. Freeman prominently and made clear that FCM's primary goal was not only to install Dr. Freeman on MindMed's Board, but also to re-instate him as an officer of the Company. *See* Rule 12(b)(6) Opp. § II. On June 25, 2023, Dr. Freeman made a last-ditch attempt to salvage FCM's failed proxy campaign, demanding, on FCM's behalf, that MindMed's Inspector of Elections not certify the results of the Annual General Meeting. Compl. ¶ 25; ECF No. 33-3 Ex. A.

### D.    MindMed Files the Instant Lawsuit.

On July 26, 2023, MindMed filed the instant lawsuit in response to Defendants' repeated and flagrant violations of the Separation Agreement. Barrow Decl. ¶ 10.  As discussed, both Dr. Freeman and FCM issued numerous disparaging statements about MindMed and MindMed's directors, officers, and employees in breach of the Separation Agreement. *See supra* § II.C; Rule 12(b)(6) Opp. §§ III.B.1-2.

Dr. Freeman and FCM have also disclosed and misused confidential MindMed information. *See, e.g.*, Barrow Decl. ¶ 9; Liverzani Decl. ¶ 29; Compl. ¶ 90. Dr. Freeman's attempt

to counter this evidence with a declaration from Jake Freeman, at most, creates a factual dispute. *See* ECF No. 75-2 ("J. Freeman Decl."). Among other things, the declaration—which focuses solely on Jake's November 4, 2022 "Psychedelic Invest" interview (*id.* ¶¶ 5-7)—does not address Jake's October 6, 2022 interview, during which he described and opined on the significance of certain communications from the FDA that were memorialized in minutes maintained by MindMed. Compl. ¶ 87. Jake said in the same interview that he was aware of "forced resignations" at MindMed that he was "not at liberty to discuss," and that he could not "comment" on the *Hurst* lawsuit because "some of [the] information is confidential." *Id.* ¶ 88. Mr. Barrow has submitted a sworn declaration stating that the FDA minutes referenced by Jake in the October 6 interview were confidential information that has never been made public. *See* Barrow Decl. ¶ 9.

###### E.     This Lawsuit Is Not the *Hurst* Lawsuit.

The Court is familiar with Dr. Freeman's "feud" with Mr. Hurst from the sprawling lawsuit that Dr. Freeman is pursuing against Mr. Hurst and others, filed before the events relevant to the instant case even began. *Freeman v. Hurst*, Case No. 22-cv-01433-RFB-VCF. Dr. Freeman tries to tie his narrative in that case to MindMed's Complaint by claiming that *this* lawsuit involves "allegations of misconduct regarding Hurst's schemes" and "self-dealing" and "attempts to continue and cover-up [Hurst's] fraud." Anti-SLAPP Mot. at 19-20. It does not. Mr. Hurst is mentioned exactly once in the Complaint—in the context of FCM operating as Dr. Freeman's alter ego (because FCM publicly took credit for suing Mr. Hurst and others). Compl. ¶ 98. Dr. Freeman's attempts to tie MindMed to his feud—and separate lawsuit—with Mr. Hurst using documents attached to the Anti-SLAPP Motion are equally unpersuasive. For example, Dr. Freeman argues that Mr. Hurst withheld 20 million Savant shares from him and, when Dr. Freeman tried to gain control of those shares, "Hurst and MindMed blocked him." Anti-SLAPP Mot. at 3. Yet none of the unauthenticated emails cited in support of this statement suggest that MindMed "blocked" the distribution of Savant shares. Dr. Freeman's documents in fact show the opposite: that he was told repeatedly that MindMed was not involved in distributing Savant shares and should stop conflating the two entities. *See* Mot. Ex. 18 (Mr. Hurst asking Dr. Freeman to stop copying MindMed "on these emails regarding the share distribution . . . and that such emails be

sent to [his] Savant email not [his MindMed] email"); Mot. Ex. 23 (Mr. Hurst writing, "I think it would be best to keep [MindMed] and Savant separate. Your issues with [MindMed] and our partnership on Savant are best treated independently if we are to do what's best for the Savant members."); Mot. Ex. 24 (similar).[8]

### III.   LEGAL STANDARD

#### A.   Nevada's Anti-SLAPP Statute.

Nevada's anti-SLAPP statute articulates a two-step analysis. *First*, "the court shall . . . [d]etermine whether the moving party has established, by a preponderance of the evidence, that the claim is based upon a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern." NRS 41.660(3)(a). *Second*, "[i]f the court determines that the nonmoving party has met the burden pursuant to paragraph (a), determine whether the plaintiff has demonstrated with prima facie evidence a probability of prevailing on the claim." *Id*. 41.660(3)(b). This second step considers whether MindMed's claims "have minimal merit," *Smith v. Zilverberg*, 481 P.3d 1222, 1229 (Nev. 2021), and incorporates "the same burden of proof" as California's anti-SLAPP statute. NRS 41.665(2).

#### B.   Anti-SLAPP Motions in Federal Court.

"The degree to which [state] anti-SLAPP provisions are consistent with the Federal Rules of Civil Procedure has been hotly disputed." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018). Indeed, as this Court has noted, "[t]he Ninth Circuit has never explicitly held that Nevada's anti-SLAPP statute may be brought in federal court." *Wilgar v. OPM Las Vegas Corp.*, 2020 WL 1433523, at *5 n.1 (D. Nev. Mar. 23, 2020) (Boulware, J.). Accordingly, the Ninth Circuit evaluates each statutory provision separately to determine whether it can be applied consistently with the Federal

---

[8] In describing his feud with Mr. Hurst, Dr. Freeman cites extensively to his Amended Complaint in the *Hurst* lawsuit. *See, e.g.*, Anti-SLAPP Mot. at 2-13 (citing *Hurst* Amended Complaint (ECF No. 41) more than two dozen times). MindMed objects to the admissibility of this pleading because, while purportedly verified by Dr. Freeman, the pleading sets forth numerous allegations and "facts" that are clearly not within Dr. Freeman's personal knowledge. *See, e.g.*, *Hurst*, No. 22-cv-01433-RFB-VCF, ECF No. 41 ¶¶ 60, 168, 177-178, 181-182, 184, 197, 202, 301(n); *see also Moran v. Selig*, 447 F.3d 748, 760 n. 16 (9th Cir.2006) (at summary judgment, verified complaint must be "based on personal knowledge and set[] forth specific facts admissible in evidence").

Rules. *See, e.g.*, *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (statutory

discovery stays inconsistent with the Federal Rules and, thus, inapplicable in federal court).

Anti-SLAPP Motions filed in federal court are reviewed pursuant to Rule 12(b)(6) or Rule

56, depending on whether the motion challenges the legal or factual sufficiency of the complaint:

> [W]hen an Anti-SLAPP motion to strike challenges only the legal sufficiency of
> a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6)
> standard and consider whether a claim is properly stated. And, on the other hand,
> when an Anti-SLAPP motion to strike challenges the factual sufficiency of a
> claim, then the Federal Rule of Civil Procedure 56 standard will apply. But in
> such a case, discovery must be allowed, with opportunities to supplement
> evidence based on the factual challenges, before any decision is made by the
> court. A contrary reading of these anti-SLAPP provisions would lead to the stark
> collision of the state rules of procedure with the governing Federal Rules of Civil
> Procedure while in a federal district court.

*Planned Parenthood*, 890 F.3d at 834–35; *see also Smith & Wesson Brands, Inc. v. SW N. Am.,*

*Inc.*, 2023 WL 4350582, at *2 (D. Nev. July 5, 2023) (applying *Planned Parenthood* to Nevada

anti-SLAPP statute).[9]

Dr. Freeman's Anti-SLAPP Motion fails under both standards. Dr. Freeman's legal

challenges to the Complaint (*see* Anti-SLAPP Mot. at 29-30, 35-39) fail. *See generally* Rule

12(b)(6) Opp.[10] The remainder of Dr. Freeman's 45-page motion—which relies on 60 improperly

authenticated exhibits and three untested declarations—must be adjudged pursuant to Rule 56. *See*

*Planned Parenthood*, 890 F.3d at 834-45.[11] Applying that standard, it is clear that Dr. Freeman's

---

[9] The Ninth Circuit's *Planned Parenthood* decision specifically addresses California's anti-SLAPP
statute. *See* 890 F.3d at 832-34. However, Nevada's anti-SLAPP statute was modeled after
California's and explicitly incorporates the California statute's burden of proof. *See* NRS
41.665(2); *Smith & Wesson Brands*, 2023 WL 4350582, at *4 ("[T]he Nevada and California anti-
SLAPP statutes are functional equivalents.") (citing *Taylor v. Colon*, 482 P.3d 1212, 1216 (Nev.
2020)); *see also Omerza v. Fore Stars, Ltd*, 455 P.3d 841, n.2 (Nev. 2020) (referencing "extensive
similarities between California's and Nevada's anti-SLAPP statutes").

[10] For some of these arguments, Freeman makes a legal <u>and</u> factual challenge.
*E.g.*, Anti-SLAPP Mot. at 37-38 (arguing that Freeman is not FCM's alter ego "based on the
allegations in the complaint" and "because of affirmative evidence confirming the parties'
separation"). In such cases, MindMed addresses the legal challenges in the 12(b)(6) Opp. and the
factual challenges herein.

[11] Despite removing this lawsuit to federal court, both FCM and Dr. Freeman have urged this Court
to disregard the Federal Rules of Civil Procedure and stay discovery in the case pursuant to Nevada

motion—filed before any discovery has taken place in this case—does not satisfy Rule 56. Indeed, as addressed below, there are numerous factual issues precluding summary judgment.

### C.   Federal Rule of Civil Procedure 56.

Summary judgment is not appropriate if there are disputed issues of material fact. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must resolve all factual disputes and draw all reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255.

## IV.   ARGUMENT

### A.   Dr. Freeman Fails to Meet His Burden to Establish that MindMed's Claims Are Based on Protected Communications.

The first step of the anti-SLAPP analysis has "two components": (1) that MindMed's claims "are based on a communication that falls within one of the four categories enumerated in NRS 41.637"; and (2) "that the communication is truthful or [was] made without knowledge of its falsehood." *Omerza*, 455 P.3d at *2 (internal quotations and citation omitted). Only one potential statutory category of communication is at issue here: "Communication[s] made in direct connection with an ***issue of public interest*** in a place ***open to the public*** or in a ***public forum***." NRS 41.637(4) (emphases added); *see* Anti-SLAPP Mot. at 20-26.

Dr. Freeman has not met his burden to prove, by a preponderance of the evidence, that the communications at issue in this case satisfy either component. *First*, MindMed does not, contrary to Dr. Freeman's suggestion, concede that Defendants' communications were made in a public forum. And Defendants' statements disparaging MindMed and referencing confidential MindMed information were made in furtherance of a private dispute—Dr. Freeman's years-long attempt to get on the Board—not the public interest. On-point case law directly refutes Dr. Freeman's assumption that the "public interest" component is satisfied simply because MindMed's stock

---

*state* procedure. *See* ECF Nos. 64, 92. As MindMed has repeatedly explained, state procedural rules that infringe on the Federal Rules of Civil Procedure have no place in federal court. *See* ECF No. 90 at 6-9; ECF No. 94-1 at 3-4.

trades publicly. *Second*, Dr. Freeman has not established by a preponderance of the evidence that the statements were made in good faith because there is contradictory evidence in the record.

### 1.      Defendants' Statements Were Not Made in a Public Forum.

According to Dr. Freeman, "[t]he complaint concedes the statements were made in a public forum." Anti-SLAPP Mot. at 20 (citing Compl. ¶¶ 85, 111). Not so. In fact, the Complaint alleges explicitly that "Defendants have ***not*** limited their disparagement of MindMed and its management and directors to public letters and social media posts." Compl. ¶ 135 (emphasis added). Defendants sent a letter to McLean Hospital, which purported to detail "Serious Allegations" against Carol Vallone, who serves as the chair of both MindMed's Board of Directors and McLean's Board of Trustees. Compl. ¶¶ 136-39; Compl. Ex. I. Dr. Freeman does not explain why the letter, which was addressed to a handful of individuals, should be deemed a "public" forum. Moreover, even for Defendants' online statements, Nevada law is clear that not "every website is a 'public forum'" for purposes of anti-SLAPP protection. *Kosor v. Olympia Cos., LLC*, 478 P.3d 390, 395-96 (Nev. 2020) (explaining that, on this point, Nevada law differs from California law). That the Complaint occasionally uses the word "public" does not change this analysis.

Because FCM previously made a similar argument which MindMed refuted, Dr. Freeman was on notice that MindMed in no way "concede[s]" the public nature of Defendants' statements. *See* ECF No. 33 at 19-20. His choice to waste the Court's time by simply repeating the same argument now is inexplicable. Dr. Freeman's failure to establish, *with proof*, that this case involves communications made in a public forum is reason enough to deny his Anti-SLAPP Motion.

### 2.      Defendants' Statements Did Not Concern the Public Interest.

Nevada has adopted certain "guiding principles"—called the *Shapiro* factors—to determine whether an issue is in the public interest. *Coker v. Sassone*, 432 P.3d 746, 750 (2019). These principles caution that "the focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for a private round of controversy." *Id*. Dr. Freeman has been angling to install himself on MindMed's Board since 2021. Compl. Ex. J at 150-51. When his private pleas were unsuccessful, he pivoted to using FCM to secure a Board seat and, ultimately, control over MindMed. Compl. ¶ 19; Compl. Ex. N at 269. The formation of FCM and

the resulting proxy fight were merely the next strategy employed by Dr. Freeman in this private dispute. Indeed, Dr. Freeman admits as much when he asks the Court to view his statements "in the context of the long-simmering dispute . . . between the parties." Anti-SLAPP Mot. at 25. And regardless, Defendants' juvenile and petty attacks on MindMed and its leadership bely any suggestion that their communications furthered the public interest. *See, e.g.*, Compl. ¶ 121 (claiming "the only thing bigger than . . . [MindMed CEO Robert] Barrow's ego is his paycheck"), ¶ 128 (caricatured, handwritten meme claiming that "money," "status," and "selling RSU for 'tax purposes'" is "what gives Barrow feelings of power"); *see Coker*, 432 P.3d at 750 (requiring "some degree of closeness between the challenged statements and the asserted public interest").

Dr. Freeman makes four arguments in support of the notion that his statements furthered the public interest. None has merit.

**First**, Dr. Freeman suggests the Court adopt a blanket rule that statements criticizing a public company, particularly during a proxy contest, further the public interest. *See* Anti-SLAPP Mot. at 20-23. But, as Dr. Freeman acknowledges, Nevada looks to "California case law on the question of what qualifies as a public interest" (*id*. at 21 n.10), and California courts have rejected such a blanket rule. In *Suneva Medical, Inc. v. Lemperle*, 2012 WL 1484622, at *4 (Cal. Ct. App. Apr. 30, 2012), the court explained that "[i]ssuing press releases . . . and being a publicly traded company are generic facts that apply to numerous other companies. Such facts do not make the Proxy Challenge a matter of public interest without evidence showing interest by a broad segment of society in the Company." *Id*. (citation omitted); *see also Steep Hill Lab'ys, Inc. v. Moore*, 2018 WL 1242182, at *6-7 (N.D. Cal. Mar. 8, 2018) (concluding communications about companies do not concern the public interest "simply because the companies might be large or powerful"), *aff'd*, 744 F. App'x 443 (9th Cir. 2018).

Dr. Freeman has not and cannot offer evidence—much less a preponderance of it—that "a broad segment of society" took interest in his disparagement of MindMed's leadership. To the contrary, Dr. Freeman admits that his statements "would hardly be interesting to anyone *besides* current MindMed shareholders." ECF No. 67 at 19 (emphasis in original). And while "[t]he proper management of a company is a matter of public interest to the company's customers and

employees, and the direct participants, it is not a matter of public interest within the meaning" of the anti-SLAPP statute. *Suneva*, 2012 WL 1484622, at *4.[12]

The case law cited by Dr. Freeman (Anti-SLAPP Mot. at 21-23) is distinguishable. *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 151 (2013), dealt with an investment scam and FBI investigation of the company's founder—facts not at issue here. *Charney v. Brown*, 2017 WL 6350557, at *6 (Cal. Ct. App. Dec. 13, 2017), concerned the very public and controversial termination of American Apparel's CEO. American Apparel "employed thousands of workers worldwide and operated 250 stores globally"; it "had 180 million shares . . . outstanding"; and "both the general and financial media regularly covered American Apparel and developments related to the company." *Id*. at *4. Dr. Freeman offers no evidence suggesting that MindMed has anywhere near the notoriety and global footprint of American Apparel. And Dr. Freeman's reliance on a smattering of out-of-circuit case law espousing the importance of shareholder voting likewise misses the mark—either because the cases do not address anti-SLAPP at all (*Pell* and *Applied Energetics*) or because they conclude the statute does not apply (*Agar*).[13] Nor do the cases suggest that statements made during proxy fights are immune from liability. *Cf. USA Techs., Inc. v. Tirpak*, 2012 WL 1889157, at *1, 9-10 (E.D. Pa. May 24, 2012) (enjoining defendants during proxy campaign because parties had negotiated agreement with non-disparagement provision, thereby "waiv[ing] their respective rights to the speech" at issue).

Dr. Freeman also argues that Defendants' statements are "fair game" and "of interest to the public" based on Mr. Hurst's supposed "misdeeds" and "notoriety." Anti-SLAPP Mot. at 23. This lawsuit, however, is not about Mr. Hurst. *See supra* § II.E. That Dr. Freeman spends more than a third of his 45-page motion chronicling myriad issues with his former business partner—including a convoluted conspiracy theory involving self-dealing (Anti-SLAPP Mot. at 2-13)—does not alter

---

[12] Courts have also rejected Freeman's suggestion (Anti-SLAPP Mot. at 23) "that statements regarding public figures necessarily relate to a public interest." *Smith*, 481 P.3d at 1227.

[13] Freeman cites a handful of additional cases in a footnote (Anti-SLAPP Mot. at 22 n.12) but none imposes a blanket rule that statements about public companies—even statements made during proxy contests—are protected communications. Such an approach would run counter to Nevada law, which cautions that the "public interest does not equate with mere curiosity." *Smith*, 481 P.3d at 1227 (internal quotations and citation omitted).

the Complaint, which limits its breach of contract allegations to Defendants' disparagement of MindMed and its **current** leadership and unlawful retention of MindMed's confidential information. Dr. Freeman cites no authority that allows him to fabricate a public interest by injecting irrelevant "facts" into an otherwise straightforward breach of contract action.

***Second***, Dr. Freeman argues that statements furthering breakthrough developments in emerging industries are in the public interest. (Anti-SLAPP Mot. at 23-24.) This paints with far too broad a brush. "[T]he focus of the anti-SLAPP statute must be on the specific nature of the speech rather than on generalities that might be abstracted from it." *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 111 (2004). Thus, in *Mann*, the court distinguished between defendants' asserted public interest (pollution) and the specific nature of the statements at issue (unlawful dumping of toxic chemicals), which "were not about pollution or potential public health and safety issues in general, but about [plaintiff's] specific business practices." *Id.*[14] Similarly here, Defendants' statements did not address public concerns about breakthrough developments in emerging industries; they were uniformly focused on MindMed's specific business practices. *See, e.g.*, Compl. ¶ 110 (accusing "MindMed's management of 'divid[ing] its attention among too many projects" and criticizing the "compensation structure for Board members"), ¶ 115 ("MindMed's cash burn rate was too high, its leadership was suffering from 'a lack of focus,' and its 'course needs to be corrected'"), ¶ 121 ("MindMed's CEO Robert Barrow lacked 'an advanced degree'" and "the only thing bigger than . . . Barrow's ego is his paycheck"); *supra* § II.C. Notwithstanding Dr. Freeman's efforts to recast them in his brief, none of the disparaging statements have anything to do with "reliev[ing] real suffering" or MindMed being an "ambassador for the psychedelic pharmaceutical industry." Anti-SLAPP Mot. at 24; *see Mann*, 120 Cal. App. 4th at 111 ("If we were to accept [defendants'] argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute.") (citation omitted).[15]

---

[14] Dr. Freeman blatantly mischaracterizes *Mann*, claiming that the court found "statements trying to protect public health and safety were in the public interest." (Anti-SLAPP Mot. at 23 n.13.)

[15] The remaining case law cited by Dr. Freeman (Anti-SLAPP Mot. at 23-24) is distinguishable. *See DuPont Merck Pharm. Co. v. Super. Ct.*, 78 Cal. App. 4th 562, 567 (2000), *as modified* (Feb.

**Third**, Dr. Freeman argues that because his statements were made during a proxy fight, "a sufficiently functional relationship exists between the statements and the public interests." Anti-SLAPP Mot. at 24-25. This argument fails because, as discussed *supra*, Dr. Freeman has not established that the statements concerned the public interest. *See FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 149 (2019) (first step asks whether "the content of the speech" addresses an issue of public interest; second step looks at "context" to determine whether a "functional relationship exists"). Nor is Dr. Freeman correct that the allegations in the Complaint "were all made in furtherance of the proxy campaign." Anti-SLAPP Mot. at 25. The Complaint alleges that Defendants made disparaging statements before, after, and outside of the proxy fight—including in a letter sent to a third-party non-shareholder. *See* Compl. ¶¶ 136-140; Compl. Ex. I. Dr. Freeman's "functional relationship" argument fails.[16]

**Fourth**, Dr. Freeman argues that his wrongful retention of MindMed's confidential information—in addition to his disparagement of MindMed—is protected under the anti-SLAPP statute, relying on an unpublished trial court decision finding that a former hospital employee who sent certain confidential information to his private email account to assist in "his good faith disclosures" concerning patient safety was protected under the anti-SLAPP statute. *New Lifecare Hosps.*, 2015 Nev. Dist. LEXIS 2751, *6; Anti-SLAPP Mot. at 25-26. Here, in contrast, Dr. Freeman offers no evidence that his wrongful retention of MindMed's confidential information was limited to (or in furtherance of) his alleged safety concerns. Indeed, the Complaint alleges

---

14, 2000) (statements about pharmaceutical product purchased by "[m]ore than 1.8 million Americans" to treat "life-threatening conditions" concerned public interest); *Glob. Plasma Sols., Inc. v. IEE Indoor Env't Eng'g*, 600 F. Supp. 3d 1082, 1093 (N.D. Cal. 2021) (statements concerning "efficacy of products" on "issue of the removal of airborne viruses from indoor environments" in light of COVID-19 in the public interest); *New Lifecare Hosps. of N. Nev. v. Wright*, 2015 Nev. Dist. LEXIS 2751, at *1-2 (Dist. Ct. Nev. Sept. 18, 2015) (statement concerning "a tragic death of a patient [resulting from] poor hospital management" in the public interest).

[16] Dr. Freeman cites *Agar v. Judy*, 151 A.3d 456 (Del. Ch. 2017), in support of an argument that "the ardent tone of certain statements" made during the proxy fight do not "forfeit protection." Anti-SLAPP Mot. at 25. But *Agar* declined to hold that the defamation claims there were protected by the state's anti-SLAPP statute. *Compare* 151 A.3d at 459, *with* Anti-SLAPP Mot. at 25 (falsely suggesting court determined statements were "protected"). The cited discussion instead concerned the legal sufficiency of defamation claims, which is not at issue here.

misappropriation of a huge swath of company material years before the statements at issue in this case. *See* Compl. ¶ 78. Dr. Freeman also contradicts himself—claiming both that he did not retain any confidential information and that, if he did, it was in furtherance of protected communications. *Compare* S. Freeman Decl. ¶¶ 8-9, *with* Anti-SLAPP Mot. at 25-26. Both things cannot be true.

### 3.    Dr. Freeman Has Not Shown by a Preponderance of the Evidence that the Communications Were Made in Good Faith.

**First**, in arguing that the statements were mere opinions incapable of being false (Anti-SLAPP Mot. at 26-27), Dr. Freeman ignores the vast majority of *factual* statements identified in the Complaint—including, *inter alia*: (1) allegations that Mr. Barrow was making "false[] claims" about MindMed and had "misrepresented [] lab studies" (Compl. ¶ 122); (2) suggestions that Mr. Barrow lied about his professional background, received a pay raise of over "one hundred times" his pay at his prior company, and had a conflict of interest that posed potential "serious legal liability" (Compl. ¶¶ 125-127; Compl. Ex. F); and (3) claims that management's "apparent lack of expertise . . . likely caused damaging and lasting reputation effects with the FDA [and] may lead to a more cautious and guarded FDA approach to MindMed's clinical trials in the future" (Compl. ¶¶ 147-150; Compl. Ex. L). *See also* Rule 12(b)(6) Opp. §§ II, III.B.1-2. Dr. Freeman's suggestion that "[m]ost, if not all, of the specific statements in the complaint" are *opinion* statements is wrong. *See* Anti-SLAPP Mot. at 27.

**Second**, Dr. Freeman's declaration is insufficient to satisfy his burden because there is "contradictory evidence in the record." *Stark v. Lackey*, 458 P.3d 342, 347 (Nev. 2020). For example, Dr. Freeman takes the position that his declaration and the exhibits to his motion evidence his good-faith belief concerning the Hurst-Savant conspiracy theory and Mr. Barrow's and Ms. Vallone's alleged effort to cover it up. *See* Anti-SLAPP Mot. at 28. But none of the documents attached to Dr. Freeman's motion actually say what he claims they do, and many contradict his theory. *See supra* §§ II.A, II.E; *see also supra* notes 3, 6-8. And Dr. Freeman ***still*** cannot cite a single contemporaneous document suggesting he was fired for raising safety issues yet maintains that unsubstantiated argument anyway. *See supra* § II.A. Under these circumstances, Dr. Freeman's declaration is not credible and, therefore, does not establish good faith by a

preponderance of the evidence. *See Wilgar*, 2020 WL 1433523, at *7 (dismissing anti-SLAPP motion because good-faith declarations were not credible and contradicted by the record).

***Finally***, Dr. Freeman suggests that he "did not make statements on FCM's behalf, but to the best of my knowledge, the statements MindMed attributes to FCM were likewise made in good faith, supported by a reasonable basis, and believed to be true." Dr. Freeman Decl. ¶ 14. Dr. Freeman does not even attempt to explain how he can swear (in the same declaration) that he "stepped down from FCM leadership" and stopped "driving its activism" yet somehow has personal knowledge of FCM's good faith thereafter. *Id*. ¶¶ 7, 14. Nor does Dr. Freeman ever explain ***why*** he supposedly resigned from FCM if not to provide an illusory cover to his and FCM's breaches of the Separation Agreement. In any event, the evidence contradicts any suggestion that Dr. Freeman actually resigned from FCM, further undermining his declaration. *See supra* § II.C.

## B.    Dr. Freeman's "Total Immunity" Theory Is Baseless.

Dr. Freeman spills much ink arguing that "NRS 41.650 broadly grants absolute immunity from any civil action." Anti-SLAPP Mot. at 30-34. He relies on general pronouncements of the strength of Nevada's anti-SLAPP statute to suggest that this particular provision is "uniquely sweeping." *Id*. at 30-31. None of the authority Dr. Freeman cites, however, supports such an interpretation. Nothing in the legislative history—to which Dr. Freeman cites extensively— supports the idea that Nevada's anti-SLAPP statute is more protective than California's or that it offers "total immunity."[17] Indeed, interpreting NRS 41.650 as providing "total immunity" would render NRS 41.660, which specifies the procedure for litigating an anti-SLAPP motion, including a plaintiff's ability to overcome an anti-SLAPP challenge by demonstrating a probability of

---

[17] If anything, the legislative history is replete with statements representing that Nevada's statute was amended to be ***more*** consistent with California's statute, not less. *S. Comm. on Judiciary*, S.B. 286, at 3 (March 28, 2013) (statement of Marc Randazza); *S. Comm. on Judiciary*, S.B. 286, Ex. D at D1-D3 (Letter from Marc Randazza to Nevada State Senate, *Re: Report to Senate on Proposed Changes to Nevada's Anti-SLAPP Laws* (Mar. 28, 2013)); *S. Comm. on Judiciary*, S.B. 286, Ex. D at D6, D9 (Legislative Counsel's Digest (Mar. 28, 2013)). It also makes clear the reason for amending NRS 41.650 was not to offer "total immunity" but rather to clarify that a defendant who meets the statutory standard is immune from civil action and not just liability. In other words, a defendant need not proceed to trial if communications are protected by the anti-SLAPP statute. *S. Comm. on Judiciary*, S.B. 286, at 2-3 (March 28, 2013) (statement of Sen. Justin C. Jones).

prevailing on its claims, superfluous. *See* NRS 41.660(3); *Williams v. State Dep't of Corr.*, 402 P.3d 1260, 1262 (Nev. 2017) (courts must "avoid[] statutory interpretation that renders language meaningless or superfluous") (citation omitted).

Relying on this completely unsubstantiated theory, Dr. Freeman contends that by signing the Separation Agreement he did not waive protection of NRS 41.650 and, as such, the Court should read into the plain language of the parties' agreement an express carve-out for communications protected by the anti-SLAPP statute. Anti-SLAPP Mot. at 32-34. In other words, notwithstanding his agreement to a non-disparagement provision, Dr. Freeman requests free rein to disparage MindMed and its leadership simply because MindMed is a public company. *Id*. at 34. Setting aside the issue of whether the anti-SLAPP statute protects Dr. Freeman's personal pursuit of board representation (it does not, *see supra* § IV.A.2), Dr. Freeman's interpretation is completely at odds with the plain language of the statute, which does ***not*** offer "total immunity" for ***any*** type of communication. Rather, the statute "provide[s] defendants with a procedural mechanism whereby they may file a special motion to dismiss the ***meritless*** lawsuit before incurring significant costs of litigation." *Stark*, 458 P.3d 342, 345 (2020) (emphasis added); *see Navellier v. Sletten*, 29 Cal. 4th 82, 94 (2002) ("The Legislature's inclusion of a merits prong to the statutory SLAPP definition . . . preserves appropriate remedies for breaches of contracts involving speech by ensuring that claims with the requisite minimal merit may proceed."). Accepting Dr. Freeman's argument would effectively render every non-disparagement provision in an employment agreement unenforceable.

The Court should decline Dr. Freeman's attempt to use the anti-SLAPP statute to void his contractual obligations under his novel and baseless "total immunity" theory.

### C.   MindMed's Claims Have More Than Minimal Merit.

Even if the Court concludes that Dr. Freeman has met his burden to establish that the communications were made in good faith and in furtherance of the public interest, Dr. Freeman's Anti-SLAPP Motion should still be denied because MindMed's claims have more than "minimal merit." *Smith*, 481 P.3d at 1229. As addressed in MindMed's Rule 12(b)(6) Opp., MindMed's claims are legally sufficient. The additional "facts" Dr. Freeman relies upon in the instant motion

lack support and raise, at most, factual disputes—including, *inter alia*: (1) whether the Separation Agreement is void for fraud or lack of consideration; (2) the reasons for Dr. Freeman's removal from MindMed; (3) the alter ego relationship between FCM and Dr. Freeman, including whether Dr. Freeman "stepped down from FCM leadership"; (4) whether Dr. Freeman disclosed confidential Company information; and (5) whether the record supports any of Dr. Freeman's equitable defenses. Such factual disputes are improper to resolve at summary judgment. *J.W. by & through Joshua v. Clark Cnty. Sch. Dist.*, 2022 WL 4344064, at *3 (D. Nev. Sept. 19, 2022) (Boulware, J.) ("It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage.").

### 1. The Non-Disparagement Clause Is Enforceable.

Dr. Freeman argues that the non-disparagement clause is void for lack of consideration and voidable for fraud. *See* Anti-SLAPP Mot. at 35-36. Neither argument has merit.

***First***, Dr. Freeman was represented by counsel, L. Reid Skibell, during the weeks-long negotiation of the Separation Agreement. Mayhugh Decl. ¶ 3; Compl. ¶ 56. That *same counsel* is *currently* representing Dr. Freeman and FCM in another lawsuit and asserting in *that* case that the Separation Agreement is valid and enforceable. *See supra* § II.B. If the Separation Agreement had actually provided zero consideration to Dr. Freeman, it strains credulity that Dr. Freeman would still be employing the lawyer who negotiated such a raw deal on his behalf to this very day. Dr. Freeman's selective argument here that the Separation Agreement is void lacks any support in fact, law, or common sense.[18]

***Second***, Dr. Freeman's strategic assertion here that he was fraudulently induced to sign the Separation Agreement is specious. To prevail on such a theory, Dr. Freeman must show: (1) a false representation by MindMed, (2) MindMed's knowledge or belief that the representation was false, (3) MindMed's intention to induce Dr. Freeman to sign the contract, (4) Dr. Freeman's justifiable reliance, and (5) damage. *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (2004). "[F]raud is never presumed; it must be clearly and satisfactorily *proved*." *Id.* (internal quotations omitted). Dr. Freeman has done nothing of the sort:

---

[18] Mr. Skibell has also appeared for Dr. Freeman in the *Hurst* lawsuit. Mayhugh Decl. Ex. B.

- MindMed proffers evidence that it suspended Dr. Freeman after receiving an internal complaint concerning his workplace behavior. Barrow Decl. ¶ 4. Dr. Freeman *acknowledges the submission of this complaint*. *See* Anti-SLAPP Mot. at 4. While his brief glancingly argues that MindMed misrepresented the internal complaint to him, he offers no evidence whatsoever of what was even said to him by MindMed, much less how it was false. Even his own self-serving declaration is silent on the topic. *See* Anti-SLAPP Mot. at 4, 35; *cf.* S. Freeman Decl.

- Dr. Freeman theorizes that he was ousted because he raised safety concerns and to cover up misconduct by the "Enterprise"—a group of "Hurst loyalists" who "infiltrated" MindMed. Anti-SLAPP Mot. at 8, 35. As described *supra* at § II.A, II.E, the evidence proffered by Dr. Freeman for this theory borders on the mystical. Moreover, this Court has heard similar theories from Dr. Freeman in the *Hurst* case and observed that "the complexity of the facts make[s] it difficult for me to be able to make any findings on undisputed facts in this case." *See* Mayhugh Decl. Ex. C at 29.

- Dr. Freeman also theorizes that MindMed procured the Separation Agreement in order to evade a "contractual obligation to release all MindMed shares Hurst had sequestered at Savant." Anti-SLAPP Mot. at 36. Dr. Freeman identifies no contract to support this contention, instead citing email exchanges that shed no light on it. *See id*. Indeed, in an email Dr. Freeman attaches to his motion, Cynthia Hu, MindMed's former Chief Legal Officer, told Dr. Freeman explicitly that MindMed has "no dealings with Savant and certainly no role or standing in the internal affairs of Savant, including distributing those shares to its members." Mot. Ex. 59.[19]

- Dr. Freeman's discussion of reliance and damages necessarily depends on the notion that he could only be terminated for cause (and, therefore, would not have signed the Separation Agreement absent the supposed misrepresentation). Anti-SLAPP Mot. at 36. But his theory is contradicted by the Complaint, which explains: (1) "On March 1, 2020, Dr. Freeman executed an Executive Employment Agreement" (Compl. ¶ 50); (2) "[t]he first six months

---

[19] Mr. Hurst also told Freeman to stop conflating Savant and MindMed. *See* Mot. Ex. 18.

of the Employment Agreement's term effectively served as a trial period, during which the Company could terminate Dr. Freeman without [cause] without any obligation to pay him severance benefits" (*id*.); (3) MindMed's leadership received the workplace complaint about Dr. Freeman in June 2020, *i.e.*, within the six-month window (*id*. ¶ 54); and (4) at the time of his removal, "Dr. Freeman was not entitled to any severance benefits under his Employment Agreement (which, as described above, had effectively included a six-month trial period)" (*id*. ¶ 57). Dr. Freeman offers no support in his conflicting interpretation of the Employment Agreement and, thus, at most the current record reflects ambiguity, which is not properly resolved at this early stage in the litigation. *See* Rule 12(b)(6) Opp. § III.A (any ambiguity in contract interpretation should be resolved in MindMed's favor).

The evidence concerning the purported invalidity of the Separation Agreement is far from "clear and convincing." Anti-SLAPP Mot. at 36. Indeed, the record demonstrates that Dr. Freeman was well aware of the validity of that agreement—and his obligations therein—yet made a calculated decision to breach them anyway. *See, e.g.*, S. Freeman Decl. ¶ 7 (representing that Dr. Freeman "stepped down from FCM leadership," which he had no reason to do if the Separation Agreement was void); *supra* § II.C (referencing need to respect confidentiality obligations); Anti-SLAPP Mot. at 16 n.8 (referencing desire to comply with non-disparagement provision by redacting references to MindMed in a lawsuit initiated by Dr. Freeman over a year ago).

### 2. The Statements Identified in the Complaint Clearly Breach the Non-Disparagement Clause.

As addressed in MindMed's Rule 12(b)(6) Opp., the statements alleged in the Complaint are clearly disparaging and violate the Separation Agreement. Dr. Freeman's arguments to the contrary are unavailing. In addition to those legal arguments, Dr. Freeman makes factual challenges concerning (1) FCM's status as Dr. Freeman's alter ego and (2) Freeman's good faith belief of the truthfulness of his disparaging statements. Neither argument has merit.

*First*, MindMed's alter-ego allegations are amply supported by contemporaneous evidence demonstrating that Dr. Freeman continued to manage and speak on behalf of FCM—even after his purported resignation. ECF No. 33 at 10-13. Freeman's "affirmative evidence"—consisting of his

self-serving, conclusory declaration and one email exchange between Jake Freeman and Carol Vallone (Anti-SLAPP Mot. at 37)—suggests, at most, disputed issues of material fact, which cannot be resolved on summary judgment. *See J.W.*, 2022 WL 4344064, at *3.[20]

**Second**, nothing in the Separation Agreement exempts statements that are true or made in good faith. *See* Rule 12(b)(6) Opp. § III.B.3.c. Thus, Freeman's argument that "the record makes plain" that he "believed" the disparaging statements to be true is no defense. In any event, Dr. Freeman's good-faith belief is disputed. *See supra* § IV.A.3; Rule 12(b)(6) Opp. § III.B.3.c.

### 3.    Defendants Breached the Confidentiality Provision.

The Complaint adequately alleges that Defendants breached the Separation Agreement's confidentiality provision. *See* Rule 12(b)(6) Opp. § III.C. And the factual record is in dispute. For example, MindMed's CEO Robert Barrow has submitted a declaration that Jake Freeman, during an October 6, 2022 interview, "described and opined on the significance of certain communications from the FDA . . . that ha[ve] never been made public." Barrow Decl. ¶ 9. Dr. Freeman contends that he did not have access to this information because any such meetings postdated his separation. Anti-SLAPP Mot. at 40. Not so. The context of Jake's interview—referencing "preclinical work . . . that goes back many years" and "the original work that the FDA wanted" (Mayhugh Decl. ¶ 7)—makes clear that he was referencing early development of MM-110, which was overseen by Dr. Freeman. *See* Compl. ¶¶ 45, 47, 53. Jake's declaration does not disavow that he received this information from Dr. Freeman. Indeed, it does not address the October 6 interview at all. *Cf.* J. Freeman Decl. Any factual disputes are improper to resolve at this stage. *See J.W.*, 2022 WL 4344064, at *3.

### 4.    Dr. Freeman's Damages Argument Is Baseless.

Dr. Freeman argues without support that the only damages available to MindMed in this lawsuit consist of a diminution in share price. Anti-SLAPP Mot. at 42-43. Setting aside whether Dr. Freeman's proffered evidence proves that Defendants' repeated breaches of the Separation

---

[20] For example, Freeman claims that he and "FCM observed all corporate formalities." Anti-SLAPP Mot. at 37 (citing S. Freeman Decl. ¶ 9). As MindMed pointed out in prior briefing, FCM does not in fact observe all corporate formalities; it failed to pay its Wyoming state franchise taxes. ECF No. 33 at 6 n.4.

Agreement had **no** effect on MindMed's stock price (it does not), Dr. Freeman's argument ignores that contract damages are not so limited; they "should place the plaintiff in the position he would have been in had the contract not been breached." *Hornwood v. Smith's Food King No. 1*, 807 P.2d 208, 211 (Nev. 1991). As detailed in MindMed's Initial Disclosures, Defendants' conduct forced MindMed "to divert resources from core business functions and caused harm to MindMed's business operations and reputation." Mayhugh Decl. ¶ 8. In addition to these compensatory damages, MindMed seeks punitive damages and attorneys' fees. *Id*.

### 5.    Laches Does Not Bar MindMed's Claims.

There is a "'strong presumption [] that laches is inapplicable'" where a party has filed suit within the statute of limitations. *See Two Plus Two Publ'g, LLC v. Jacknames.com*, 2010 WL 4281791, at \*2 (D. Nev. Sept. 30, 2010) (citation omitted); *see also* NRS 11.190(2)(c) (four-year statute of limitations for contract claims). "Laches is more than mere delay in seeking to enforce one's rights, it is delay that works a disadvantage to another." *Home Sav. Ass'n v. Bigelow*, 779 P.2d 85, 86 (Nev. 1989) (reversing dismissal based on laches defense).

Dr. Freeman cannot show that the timing of this action—which MindMed initiated less than a year after Defendants started disparaging MindMed and one **day** after the Inspector of Elections certified MindMed's win in the proxy contest (Compl. ¶¶ 18, 26)—was unreasonable. His claim that "MindMed's delay was tactical" is completely unsubstantiated, as is his suggestion that, had MindMed "communicated early on its belief that statements in a run-of-the-mill proxy contest were in breach of the settlement agreement, the issue would have been settled or judicially resolved." Anti-SLAPP Mot. at 44; *see Miller v. Walser*, 42 Nev. 497, 181 P. 437, 444-45 (1919) (refusing to accept at the pleading stage unsubstantiated theory that plaintiff's delay was tactical). Indeed, Dr. Freeman's current arguments—which contend that the Separation Agreement was fraudulently induced and that it exempts disparaging statements postdating the effective date of the Agreement—bely the notion that the parties would have reached a mutually agreeable resolution "months" ago. Rather, it is much more likely that Dr. Freeman would have taken issue with this lawsuit if MindMed had filed in the **middle** of the proxy contest. Surely Dr. Freeman would have objected that MindMed was undermining and interfering with the shareholder vote.

The only "evidence" Dr. Freeman cites in support of this argument is a cease-and-desist letter from counsel to the individual directors and officers at MindMed promptly alerting FCM to its defamatory conduct following the McLean letter. *See* Mot. Ex. 33; *supra* § IV.A.1; Anti-SLAPP Mot. at 44-45. The letter does not mention, much less seek to enforce, the Separation Agreement, to which MindMed's individual directors and officers are not parties. Compl. Ex. A. And it certainly does not prove Dr. Freeman's unsubstantiated theory that MindMed "acquiesced" to Defendants' disparaging proxy campaign. Anti-SLAPP Mot. at 45. In fact, quite the opposite— the letter put Defendants on notice that they should immediately "cease and desist from . . . making or publishing false statements about [MindMed's Board]." Mot. Ex. 33.[21]

**D.    At the Very Least, MindMed Is Entitled to Discovery.**

Dr. Freeman's premature Anti-SLAPP Motion should be denied on the merits. Filed before any discovery has taken place, it asks this Court to immunize Dr. Freeman and his alter ego FCM from their obvious breaches of the Separation Agreement based on new and unsubstantiated facts and specious legal arguments. At the very least, however, MindMed must be allowed to engage in discovery before Dr. Freeman's one-sided, fact-intensive narrative is credited. *See Planned Parenthood*, 890 F.3d at 834–35 ("when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim . . . discovery must be allowed"); *Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Rsrv.*, 323 F.3d 767, 773 (9th Cir. 2003) (discovery should be granted "freely" where summary judgment motion is filed "before a party has had any realistic opportunity to pursue discovery"); *see also* Mayhugh Decl. ¶¶ 9-13 (identifying discovery needed to oppose Dr. Freeman's Anti-SLAPP Motion).

**V.    CONCLUSION**

MindMed respectfully requests that the Court deny Dr. Freeman's Anti-SLAPP Motion or, in the alternative, defer ruling on the Motion until MindMed has an opportunity to engage in discovery pursuant to Federal Rule of Civil Procedure 56(d).

---

[21] Dr. Freeman also cursorily mentions possible waiver and failure-to-mitigate defenses. *See* Anti-SLAPP Mot. at 45. Neither is discussed in any detail, reflected on the face of the Complaint, or substantiated by any evidence. Dr. Freeman has not met his burden to prove either defense.

DATED this 5th day of December, 2023.

                                    **DICKINSON WRIGHT PLLC**

                                    */s/ Justin J. Bustos*
                                    Justin J. Bustos
                                    NV Bar No. 10320
                                    Email: jbustos@dickinson-wright.com
                                    100 West Liberty Street, Suite 940
                                    Reno, NV 89501
                                    Tel: (775) 343-7500
                                    Fax: (844) 670-6009

                                    **COOLEY LLP**
                                    Sarah Lightdale *(pro hac vice)*
                                    Kaitland Kennelly *(pro hac vice)*
                                    Amanda Liverzani *(pro hac vice)*
                                    Email: slightdale@cooley.com
                                    Email: kkennelly@cooley.com
                                    Email: aliverzani@cooley.com
                                    55 Hudson Yards
                                    New York, NY 10001
                                    Tel: (212) 479-6000
                                    Fax: (212) 479-6275

                                    Alexandra Rex Mayhugh *(pro hac vice)*
                                    Email: amayhugh@cooley.com
                                    Wells Fargo Center, South Tower
                                    355 South Grand Avenue, Suite 900
                                    Los Angeles, CA 90071
                                    Tel: (213) 561-3250
                                    Fax: (213) 561-3244

                                    *Attorneys for Plaintiff Mind Medicine*
                                    *(MindMed) Inc.*

## CERTIFICATE OF SERVICE

I certify that I am an employee of DICKINSON WRIGHT PLLC and that on the 5th day of December, 2023, I electronically filed and served a true and correct copy of **PLAINTIFF'S OPPOSITION TO DEFENDANT SCOTT FREEMAN'S ANTI-SLAPP SPECIAL MOTION TO DISMISS** with the Clerk of the Court by using the CM/ECF filing system upon the following individual(s):

Robert J. Cassity
Erica C. Medley
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Email: bcassity@hollandhart.com
Email: ecmedley@hollandhart.com

*Attorneys for FCM MM Holdings, LLC*

Daniel F. Polsenberg
Abraham G. Smith
Lewis Roca Rothgerber Christie
3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169
Email: dpolsenberg@lewisroca.com
Email: asmith@lewisroca.com

*Attorneys for Scott Freeman*

*/s/ Laura P. Browning*
An Employee of Dickinson Wright PLLC

**EXHIBIT TABLE**

| Exhibit | Description | Page Numbers |
|---------|-------------|--------------|
| 1 | Declaration of Alexandra Rex Mayhugh in Support of Plaintiff's Opposition to Defendant Scott Freeman's Anti-SLAPP Special Motion to Dismiss (with attached Exhibits) | 001-072 |