1  DANIEL F. POLSENBERG (SBN 2376)
   ABRAHAM G. SMITH (SBN 13,250)
2  LAUREN D. WIGGINTON (SBN 15,835)
   J. CHRISTOPHER JORGENSEN (SBN 5382)
3  LEWIS ROCA ROTHGERBER CHRISTIE LLP
   3993 Howard Hughes Parkway, Suite 600
4  Las Vegas, Nevada 89169-5996
   (702) 949-8200
5  (702) 949-8398 (Fax)
   DPolsenberg@LewisRoca.com
6  ASmith@LewisRoca.com
   LWigginton@LewisRoca.com
7  CJorgensen@LewisRoca.com

*Attorneys for Scott Freeman*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| MIND MEDICINE (MINDMED) INC., a British Columbia corporation,<br><br>    Plaintiff,<br>vs.<br><br>SCOTT FREEMAN, an individual, and FCM MM HOLDINGS, LLC, a Wyoming limited liability company,<br><br>    Defendants. | Case No. 2:23-cv-1354-RFB-MDC<br><br>**REPLY TO OPPOSITION TO ANTI-SLAPP MOTION TO DISMISS**<br>**(ECF No. 103)** |
|---|---|

MindMed's suit against Dr. Scott Freeman is a quintessential SLAPP. MindMed is suing Dr. Freeman, one of the company's largest equity shareholders, for exercising his fundamental right as an equity shareholder to comment on corporate mismanagement and fraud directly implicating the public interest. MindMed insists that Dr. Freeman's communications breach the non-disparagement clause of his separation agreement, but that agreement expressly protects Dr. Freeman's right to engage in this speech as an equity owner. Dr. Freeman's speech is also protected under the plain language of NRS 41.650 because the good faith nature of the speech is undisputed—MindMed nowhere alleges a knowingly false statement—while the public interest and public forum elements are plainly satisfied. MindMed fails in its opposition to show that its claims have plausible merit under NRS 41.660, and its complaint must therefore be dismissed.

**A.    Dr. Freeman's Rights as a MindMed Shareholder Preclude MindMed's Claims under the Non-Disparagement Provision**

Dr. Freeman has worn two hats in relation to MindMed—as an equity shareholder and an employee. When the separation agreement took effect on September 8, 2020, Dr. Freeman took off

one of these hats: he ceased to be a MindMed employee, but he continued as an equity shareholder. The distinction between these roles is essential to interpreting the non-disparagement provision because the separation agreement expressly preserves Dr. Freeman's rights as an equity shareholder: "This Agreement does not abrogate your existing rights under any Company benefit plan or any plan or agreement related to equity ownership in the Company." (2 App. 254, § 13.) The non-disparagement clause thus does not reach Dr. Freeman's communications exercising his shareholder rights.

Importantly, a shareholder in a public company has a fundamental right to participate in the company and the process of corporate democracy, including through a proxy campaign. Courts recognize this right, explaining that "[t]he right of shareholders to a meaningful exercise of their voting franchise and to a fair proxy contest with an informed electorate" is "sacrosanct." *Pell v. Kill*, 135 A.3d 764, 794 (Del. Ch. 2016) (emphasis added). Because an equity shareholder's right to participate in corporate democracy is fundamental, courts also consistently hold that "actions by boards of directors that threaten the voting franchise for stockholders . . . constitut[e] irreparable harm." *Higgin v. Albence*, No. 2022-0641-NAC, 2022 WL 4239590, at *29, n.226 (Del. Ch. Sept. 14, 2022) (collecting cases), *affirmed in relevant part, rev'd in part on other grounds sub nom. Albence v. Higgin*, 295 A.3d 1065 (Del. 2022). Indeed, because the business-judgment rule limits legal redress for much mismanagement, a proxy campaign calling out fraud and misconduct by corporate leadership is an essential—and, sometimes, the only—tool for shareholders to persuade the company holding their investment to change course.

MindMed does not dispute that this provision is unusual. After all, MindMed could have blocked Dr. Freeman from participating in the company as an equity shareholder by requiring him to divest his equity interest at the time of his separation.[1] But MindMed chose not to do so. To the contrary, it agreed that Dr. Freeman would keep one million MindMed options in addition to the 20,000,000 MindMed shares he already owned—and further agreed without qualification that Dr. Freeman's rights as an equity shareholder were "not abrogate[d]."

---

[1] MindMed alleges it could have terminated Dr. Freeman without cause before the vesting of his equity interests. (Compl. ¶ 50; ECF No. 103, at 20-21.)

Because Dr. Freeman, as an equity shareholder, has a fundamental right to comment on the governance of MindMed in the context of a proxy contest, and section 13 of the separation agreement expressly preserves this right, his exercise of that right cannot breach the non-disparagement provision. MindMed itself acknowledges Dr. Freeman had the right to pursue a public proxy campaign aimed at winning a board position (ECF No. 102, at 19) and alleges that his statements laid the foundation for that proxy contest. (Compl. ¶ 140.) MindMed insists, however, that Dr. Freeman's participation in the proxy campaign breached the non-disparagement provision because he made statements critical of MindMed's leadership. MindMed's position, in other words, is that Dr. Freeman was "free" to exercise his rights as an equity shareholder—but only with tape over his mouth and his arms tied behind his back. That is untenable and contrary to the separation agreement.

The burning question, which MindMed cannot satisfactorily answer, is this: What equity ownership rights does section 13 of the separation agreement protect, if not Dr. Freeman's right to meaningfully participate in the process of corporate democracy? MindMed deflects by citing to *USA Techs., Inc. v. Tirpak*, 2012 WL 1889157 (E.D. Pa. May 24, 2012) and threatening that Dr. Freeman's position means that "all non-disparagement provisions executed between a corporation and a shareholder [are] invalid." Not so. This Court need not invalidate the non-disparagement provision to conclude that it does not reach statements reasonably related to a bona fide proxy contest. MindMed also ignores the elephant in the room: the separation agreement at issue in *USA Techs.* contained no provision analogous to section 13. Another company negotiating a non-disparagement agreement with an equity shareholder has no obligation to incorporate a provision analogous to section 13.

### B.   Dr. Freeman's Communications Are Protected by Nevada's Anti-SLAPP Statute

#### 1.   The Non-Disparagement Provision Must Be Construed Consistently with NRS 41.650

NRS 41.650 is clear and unambiguous: "A person who engages in a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an

3

issue of public concern is immune from any civil action for claims based upon the communication." This plain language contemplates no exceptions and must be given effect. *See D.R. Horton, Inc. v. Eighth Judicial Dist. Court*, 168 P.3d 731, 737 (Nev. 2007) ("When a statute's language is clear and unambiguous, it must be given its plain meaning, unless doing so violates the spirit of the act."). These substantive protections are not waived by the separation agreement; to the contrary, the parties agreed that their contact "will be construed and enforced in accordance with the laws of the State of Nevada." (2 App. 255, § 18.) The non-disparagement clause must therefore be construed consistently with NRS 41.650, and so communications within the scope of NRS 41.650 cannot breach the non-disparagement clause. (ECF No. 75 ("Anti-SLAPP Mot."), at 33-34.)

Curiously, MindMed avoids NRS 41.650 altogether.[2] It focuses instead on NRS 41.660, arguing that a plain language reading of NRS 41.650 is untenable because granting immunity to good faith communications regarding an issue of public concern would render a different statutory provision—NRS 41.660—superfluous. (*See* ECF No. 103, at 17-18.) But MindMed's argument is inherently defective because it works equally well in reverse: if NRS 41.650 cannot be given its plain meaning because that would render NRS 41.660 superfluous, then NRS 41.650 is itself rendered meaningless—an equally untenable result. *See Williams v. State Dep't of Corr.*, 402 P.3d 1260, 1262 (Nev. 2017) (courts must "avoid[] statutory interpretation that renders language meaningless or superfluous").

MindMed urges this Court to disregard NRS 41.650, but nowhere argues that NRS 41.650 is ambiguous or attempts to harmonize NRS 41.650 with NRS 41.660. *Cf. Szydel v. Markman*, 121 Nev. 453, 457, 117 P.3d 200, 202-03 (2005) (when two unambiguous statutes "conflict with each other when applied to a specific factual situation" the court must attempt to harmonize them in light of the legislative intent). MindMed disregards that these statutory provisions can be readily harmonized simply by recognizing that NRS 41.650 has meaning independent of a special anti-SLAPP motion to dismiss (the procedure for which is governed by NRS 41.660).

---

[2] MindMed argues that "Dr. Freeman's interpretation is completely at odds with the plain language of the statute, which does *not* offer 'total immunity' for *any* type of communication" (ECF No. 103, at 18)—but then cites to case law (*Stark*) describing only NRS 41.660 and not NRS 41.650. The Nevada Supreme Court has never addressed the substantive immunity of NRS 41.650.

As relevant here, NRS 41.650 bestows substantive rights independent of the special motion to dismiss procedure in NRS 41.660 because it informs the construction of the parties' separation agreement, including the non-disparagement clause. (*See* Anti-SLAPP Mot. 30-34.) The parties not only selected Nevada as the forum for enforcement of their separation agreement but agreed that "[t]his Agreement . . . will be construed and enforced in accordance with the laws of the State of Nevada." (2 App. 255, § 18.) And even though MindMed knew the agreement would be construed and enforced in accordance with the laws of Nevada, the agreement nowhere waives the statutory protections of NRS 41.650.[3] Consequently, the non-disparagement clause prohibits disparaging statements *other than* "good faith communication[s] in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern." (*See* Anti-SLAPP Mot. 33-34.)

MindMed's reliance on California case law, including *Navellier v. Sletten*, 52 P.3d 703 (Cal. 2002), to set aside NRS 41.650 is unpersuasive. Through enactment of NRS 41.650, Nevada's Legislature created an intentional asymmetry with California's anti-SLAPP regime.[4] (*See* Anti-SLAPP Mot. 30-31.) California case law may aid the interpretation of NRS 41.637 and 41.660, but it is neither relevant nor persuasive as to NRS 41.650 because California has no analogue: where California simply subjects *existing* substantive rights "under the United States Constitution or the California Constitution" to the procedural expedient of the "special motion to strike," Cal. Civ. Proc. Code § 425.16(b)(1), Nevada actually *creates* standalone statutory immunity for any "person who engages in a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern," NRS 421.650. As codified in NRS 41.637, this right does not refer to or depend on another source, such as the First Amendment. So, the immunity guaranteed in NRS 41.650 is not merely access to a procedural expedient, but a substantive statutory right to engage in good-faith communications.

---

[3] This Court need not reach the question of whether NRS 41.650's protections are waivable because the separation agreement does not even arguably waive them.
[4] And the protections this provides are key to ensure public disclosure of matters of public safety, like fact that MindMed has dosed patients at *thirty-five* times the safe dose of MM-110.

### 2. Dr. Freeman's Statements Were Made in a Public Forum

MindMed disputes whether any of the alleged communications were in a public forum. (*See* ECF No. 103, at 11.) In doing so, MindMed waves away the allegations in its own complaint, which concede that Dr. Freeman's communications were made in a public forum: "the target audience" for the communications "was clearly the public," (Compl. ¶ 111), and FCM was allegedly formed as "a public relations vehicle" to achieve that end.[5] (*Id.* ¶ 92.) Further, MindMed's alleged injury is premised on the fact that these communications influenced "the public at large" (*id.*, ¶ 134). MindMed claims no damage from private communications. Plainly, and by MindMed's own concession, Dr. Freeman's alleged communications were intended for dissemination, and were in fact disseminated, in a public forum.[6]

Tellingly, MindMed substantively disputes the public nature of only one communication: a November 21, 2022, letter Jake Freeman and Chad Boulanger sent to Carol Vallone, copying several others at McLean Hospital. (*See* ECF No. 103, at 11.) But the statements in the November 21 letter were not made by Dr. Freeman. MindMed misleadingly asserts that the November 21 letter was sent by "Defendants." (Compl. ¶ 136, ECF No. 103, at 15.) But in fact, Dr. Freeman's name does not appear on the letter and MindMed fails to identify how Dr. Freeman is associated with the letter.[7] (Compl. Ex. I.) Consequently, MindMed has not meaningfully disputed that *Dr. Freeman's* alleged statements were made in a public forum. Further, the content of the November 21 letter—disclosing that Ms. Vallone oversaw a MindMed clinical trial that dosed patients with thirty-five times the safe MM-110 dose as determined by the FDA—was in service of a proxy campaign and clearly concerned an issue of public interest.

---

[5] MindMed further alleges that numerous communications were publicized on a subreddit focusing on MindMed and that defendants gave interviews to raise the profile of their statements with the public. (*See, e.g.*, Compl. ¶¶ 87, 99, 112, 114-119, 121, 134.)

[6] Even if not *every* website is a public forum, the statements at issue were intended to, and did, reach the public.

[7] MindMed continues to conflate FCM with Dr. Freeman when convenient, but has not adequately pleaded and cannot plausibly show that Dr. Freeman and FCM have an alter ego relationship. (*See* Freeman 12(b)(6) Reply 8-12.) MindMed's opposition relies on inference and innuendo to insist that Dr. Freeman controls FCM (*see* ECF No. 103 at 5), but FCM corporate documentation memorializes the reality that FCM is 50% owned by members other than Dr. Freeman, and Dr. Freeman resigned from a managerial role in September 2022. *See* Exhibit A at FCM00020; Exhibit B at FCM00022.

LEWIS ROCA

And even if FCM's statements could be attributed to Dr. Freeman under an alter ego theory—which they cannot (*see* Freeman 12(b)(6) Reply 8-12)—a single allegedly non-public statement cannot enable MindMed's complaint to survive when every other alleged statement was undisputedly public. Alternatively, because this statement squarely focused on MM-110's still-pending FDA approval, it was made "in direct connection with an issue under consideration by a legislative, executive or judicial body, or any other official proceeding authorized by law." *See* NRS 41.647(3).

### 3. Dr. Freeman's Statements Concerned the Public Interest

MindMed argues that Dr. Freeman's statements in his capacity as an equity shareholder of MindMed do not concern the public interest. For instance, MindMed argues that Dr. Freeman's personal interest in replacing company board members through a proxy campaign means that his (and FCM's) public communications were merely in furtherance of a private dispute. (*See* ECF No. 103, at 11-12.) But this argument has a defective premise: it assumes that Dr. Freeman's personal interests and the public interest are mutually exclusive. That Dr. Freeman sought a seat on MindMed's board demonstrates only that he believed he was qualified to lead the company for the benefit of all shareholders, including himself. MindMed also omits that FCM proposed a settlement with MindMed leadership under which MindMed could select any two of the nominees proposed by FCM—even if that excluded Dr. Freeman.[8] (*See* ECF No. 16, Ex. A, ¶ 12.)

MindMed also argues that Dr. Freeman cannot satisfy the public interest element of the anti-SLAPP analysis without showing that his communications interested "a broad segment of society," and that communications regarding mismanagement of a public company generally do not meet this standard. (ECF No. 103, at 12-13.) For both propositions MindMed relies on an unpublished, non-precedential California decision: *Suneva Med., Inc. v. Lemperle*, 2012 WL 1484622 (Cal. Ct. App. Apr. 30, 2012). *Suneva* is not only unpublished and non-precedential, but

---

[8] Dr. Freeman attested to this fact (*see* ECF No. 75-1, ¶ 12) and MindMed has not disputed it.

runs counter to the weight of case law recognizing that communications regarding mismanagement of a publicly traded company concern the public interest.[9]

Furthermore, Dr. Freeman's alleged communications *are* of interest to the public at large (*see* Anti-SLAPP Mot. 23-25)—but they would concern the public interest even if they interested only a subset of the public. That is because Anti-SLAPP protections also apply "where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public"—if the activity "occur[s] in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." *Du Charme v. Int'l Bhd. of Elec. Workers*, 1 Cal. Rptr. 3d 501, 510 (Ct. App. 2003) (emphasis in original).[10]

Here, even if only a subset of the public were interested—for example, MindMed shareholders and members of the public interested in emerging treatments for anxiety, migraines, depression, and/or cluster headaches—the *Du Charme* standard is satisfied. Dr. Freeman's communications were made in the context of an ongoing "controversy [or] discussion" (a proxy campaign over control of MindMed). *Id.* at 119. Enabling him to share information with other MindMed shareholders directly embodies the public policy of protecting shareholders' rights to educated participation in corporate democracy, a value that warrants protection. *See, e.g.*, *Pell*, 135 A.3d at 794. Further, psychedelic medicines have become of general interest to the public at large, both for

---

[9] *See, e.g.*, *Sugarman v. Benett*, 73 Cal. App. 5th 165, 177 (2021) ("[A] publicly traded company with many thousands of investors is of public interest because its successes or failures will affect not only individual investors, but in the case of large companies, potentially market sectors or the markets as a whole." (quoting *Global Telemedia Int'l, Inc v. Doe 1*, 132 F. Supp. 2d 1261, 1265 (C.D. Cal. 2001))); *Muddy Waters, LLC v. Superior Ct.*, 62 Cal. App. 5th 905, 918 (2021) ("[A]llegations of mismanagement or investor scams in relation to publicly traded companies are made 'in connection with an issue of public interest.'"); *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1153 (C.D. Cal. 2005) ("Several courts have held that the conduct of a publicly traded corporation, including the legitimacy of corporate actions, falls within at least one of these categories."); *Zwebner v. Coughlin*, 2005 U.S. Dist. LEXIS 52278, at *7-8 (S.D. Cal. Oct. 5, 2005) ("[M]essages posted on internet message boards that offer discussion regarding publicly traded companies fall within California's anti-SLAPP statute.").

[10] NRS 41.637(1) specifically recognizes this concept of the public interest by defining protected speech to include "[c]ommunication that is aimed at procuring . . . electoral action."

8

treatment of millions of patients suffering from anxiety, drug addiction, and depression but also a large number of investors evaluating psychedelic companies.[11]

MindMed's cursory arguments purporting to distinguish the cases that Dr. Freeman cites in his motion are also unpersuasive. (*See* ECF No. 103 p. 13.) For instance, MindMed purports to distinguish *Agar v. Judy*, 151 A.3d 456 (Del. Ch. 2017), on the grounds that the *Agar* court ultimately found Delaware's anti-SLAPP statute inapplicable. But the *Agar* court's determination was premised on language idiosyncratic to the Delaware anti-SLAPP statute—which the court recognized was markedly narrower than California's anti-SLAPP statute. *See Agar*, 151 A.3d at 474-75; *id.* at 474 n.4. Dr. Freeman's discussion of *Agar* remains pertinent, including for its recognition that vigorous criticism of company leadership is an integral and expected activity during a proxy campaign.

MindMed also purports to distinguish *Pell* and *Applied Energetics* on the basis that these cases do not apply anti-SLAPP statutes. (ECF No. 103, at 13.) Dr. Freeman never claimed otherwise. MindMed ignores the relevant proposition for which these cases stand: that equity shareholders have a fundamental right to the meaningful (i.e., informed) exercise of their voting franchise. *Pell*, 135 A.3d at 794; *Applied Energetics*, 2022 WL 956119 at *15. Not coincidentally, it is this same right with which MindMed's SLAPP attempts to interfere.[12]

### 4.    Dr. Freeman's Statements Were Made in Good Faith

Dr. Freeman has established that his alleged statements were made in good faith. (*See* Anti-SLAPP Mot. 26-28.) Good faith under Nevada's anti-SLAPP statute is established where

---

[11] *See, e.g.*, *How Psychedelic Drugs Can Be Used for Mental Health*, THE NEW YORK TIMES (Jan. 5, 2022), https://www.nytimes.com/2022/01/05/well/psychedelic-drugs-mental-health-therapy.html; *How MDMA and Psilocybin Became Hot Investments*, THE NEW YORK TIMES (May 9, 2021), https://www.nytimes.com/2021/05/09/health/psychedelics-mdma-psilocybin-molly-mental-health.html *Psychedelic Drugs Are Moving From the Fringes of Medicine to the Mainstream*, FORBES (July 5, 2021), https://www.forbes.com/sites/joshuacohen/2021/07/05/psychedelic-drugs-are-moving-from-the-fringes-of-medicine-to-the-mainstream/?sh=100b9cce6390

[12] MindMed's continued reliance on *USA Techs.* continues to miss the mark. The separation agreement *expressly* preserves Dr. Freeman's rights as an equity shareholder, whereas the court in *USA Techs.* found that the defendant waived these rights. *See USA Techs., Inc. v. Tirpak*, 2012 WL 1889157, at *10 (E.D. Pa. May 24, 2012) ("Here, there is clear and compelling evidence that USAT waived its First Amendment rights to speak about the board's pre-May 19, 2011 record.").

statements are "truthful or made without knowledge of [their] falsehood." NRS 41.637 (emphasis added). Nowhere does MindMed allege or argue that Dr. Freeman's (or FCM's) statements were knowingly false, even though that is integral to the statutory analysis—and even the dictionary definition of disparagement contemplates a "false" statement. *See Disparagement*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/legal/disparagement.[13] Indeed, MindMed skips straight to anti-SLAPP's prong two, arguing that the non-disparagement provision covers even true statements.

Notwithstanding MindMed's protestations, most if not all of Dr. Freeman's statements at issue were statements of opinion and therefore cannot be false. MindMed highlights three examples, which it contends are factual. (*See* ECF No. 103, at 16.) None of these statements, however, were made by Dr. Freeman.[14] Even so, these handpicked statements underscore MindMed's misapprehension of the distinction between fact and opinion. For example, in the third statement, FCM writes that MindMed's "apparent lack of expertise . . . *likely* caused" reputational harm with the FDA and "*may* lead to a more cautious and guarded FDA approach" in the future. (*Id.* (emphasis added).) These statements are plainly opinions: they speak of probabilistic outcomes and so cannot be "objectively verified as true or false." *Agar*, 151 A.3d at 481.

Nor has MindMed shown any record evidence contradicting Dr. Freeman's good faith. *See Panik v. TMM, Inc.*, 538 P.3d 1149, 1154 (Nev. 2023) (declaration of belief sufficient to meet good-faith requirement). MindMed, in lieu of specific argument on this point, makes a sweeping assertion that "none of the documents attached to Dr. Freeman's motion actually say what he claims they do, and many contradict his theory." (ECF No. 103, at 16.) But MindMed justifies this statement based on a mere six examples. (*See id.*) Worse, none of those examples contradict Dr. Freeman's attestations. (And again, MindMed never claims that his statements were knowingly false.) In each, MindMed highlights a detail that Dr. Freeman's documents purportedly "do not mention"—without identifying any content in the documents that actually contradicts the

---

[13] A claim for business disparagement under Nevada law similarly requires evidence of "falsehoods." *Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 125 Nev. 374, 385 (2009).
[14] MindMed conflates FCM and Dr. Freeman by attributing these communications to "Defendants."

10

statement. (*See id.* at 2-4.) Even assuming MindMed were correct about what these documents do not mention, the absence of direct support for Dr. Freeman's (or FCM's) statements in six cherry-picked documents does not establish a *contradiction* with his statements.[15] And most importantly, MindMed does not show how these examples negate Dr. Freeman's attestation of good faith. (*See* ECF No. 103, at 16-17.)

### 5. MindMed Cannot Show a Probability of Prevailing Under NRS 41.660(3)(b)

It is MindMed's burden under prong two to show that its claims against Dr. Freeman have plausible merit. Yet, as discussed in parts A and B.1 above, MindMed has abdicated its responsibility. It has not shown (1) how to harmonize the non-disparagement clause with Dr. Freeman's equity rights and the statutory protections of NRS 41.650 or (2) how, in light of those protections, Dr. Freeman's statements and actions still violate the non-disparagement clause.[16]

MindMed has not shown that any statement attributed to Dr. Freeman was made in his capacity as a former employee—for example, to criticize the conditions of his employment or termination—rather than to further his equity shareholder rights, including his right to influence corporate governance in the context of a proxy campaign. (*See* Part A, above.) Nor has MindMed demonstrated that, notwithstanding the agreement's incorporation of Nevada law—including NRS 41.650—the parties secretly intended to waive the protections of that statute. While MindMed might have a claim if *knowingly* false statements were intended to tarnish leadership's reputations, MindMed disclaims that any statement meets that standard.

### C. Dr. Freeman Did Not Breach the Agreement's Confidentiality Provisions

MindMed's claim against Dr. Freeman for breach of confidentiality provisions (ECF No. 103, at 22) similarly lacks plausible merit.[17] MindMed alleges that "[d]efendants' public

---

[15] There is also a circularity to MindMed's criticism that Dr. Freeman has not provided documentary support given that Dr. Freeman was contractually required to destroy most such documents.
[16] MindMed's claim that Dr. Freeman breached the confidentiality provision of the agreement also fails to meet this bar. *See* Part C below.
[17] Dr. Freeman incorporates his Reply to MindMed's Opposition to Dr. Freeman's Rule 12(b)(6) Motion to Dismiss, including his discussion of MindMed's claim for breach of confidentiality provisions. (*See* Freeman 12(b)(6) Reply 12.)

11

comments have revealed that" Dr. Freeman retained MindMed documents he agreed to destroy or return, and that "[i]t is evident" that Dr. Freeman shared this confidential information with Jake Freeman. (Compl. ¶¶ 85-86.) Yet, from among hundreds of pages of exhibits and dozens of statements by Dr. Freeman and FCM, MindMed conspicuously fails to connect *any* confidential document to *any* of defendants' statements—or otherwise identify *any* confidential information disclosed through these statements. Mr. Barrow's declaration fails to remedy this defect; he obliquely references only "certain communications from the FDA" but does not identify their subject matter or how any of defendants' statements evidenced their knowledge of these communications. (*See* Barrow Decl., ¶ 9.) These conclusory assertions are insufficient to constitute the evidence of a probability of prevailing on the claim. *See* NRS 41.660(3)(b).

## CONCLUSION

For these reasons, MindMed's complaint must be dismissed pursuant to NRS 41.650 and NRS 41.660.[18]

Dated this 5th day of February, 2024.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By: */s/ Abraham G. Smith*
DANIEL F. POLSENBERG (SBN 2376)
ABRAHAM G. SMITH (SBN 13,250)
LAUREN D. WIGGINTON (SBN 15,835)
J. CHRISTOPHER JORGENSEN (SBN 5382)
3993 Howard Hughes Parkway Suite 600
Las Vegas, Nevada 89169

*Attorneys for Scott Freeman*

---

[18] Dr. Freeman does not waive any arguments set forth in his Anti-SLAPP Motion to Dismiss even if they are not discussed by this Reply.

## CERTIFICATE OF SERVICE

I certify that on February 5, 2024, I served the foregoing "Reply to Opposition to Anti-SLAPP Motion to Dismiss (ECF No. 103)" through the Court's electronic filing system to the following counsel:

Justin J. Bustos
DICKINSON WRIGHT PLLC
100 West Liberty Street, Suite 940
Reno, Nevada 89501

Sarah Lightdale
Kaitland Kennelly
Amanda Liverzani
COOLEY LLP
55 Hudson Yards
New York, New York 10001

Alexandra Rex Mayhugh
COOLEY LLP
355 South Grand Avenue, Suite 900
Los Angeles, California 90071

*Attorneys for Plaintiff*

Robert J. Cassity
Erica C. Medley
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nevada 89134

*Attorneys for Defendant FCM MM Holdings, LLC*

　　　　　　　　　　　*/s/ Emily D. Kapolnai*
　　　　　　　　　　　An Employee of Lewis Roca Rothgerber Christie LLP

# INDEX OF EXHIBITS

| Exhibit No. | Description | No. of Pages |
|---|---|---|
| A | FCM's Organizational Documents | 20 |
| B | Freeman's Resignation | 1 |